1 | GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
Robert A. Goodin, State Bar No. 061302
2 | Francine T. Radford, State Bar No. 168269
3 | 505 Sansome Street, Suite 900
San Francisco, California 94111
4 | Telephone: (415) 392-7900
Facsimile: (415) 398-4321
5 | Attorneys for Plaintiff

6 | DAVIS & CERIANI, P.C.
Michael P. Cillo, Esq. *Pro Hac Vice Pending*
7 | Valeri S. Pappas, Esq. *Pro Hac Vice Pending*
Joshua D. Franklin, State Bar No. 264536
8 | 1350 17th Street, Suite 400
Denver, Colorado 80202
9 | Telephone: (303) 534-9000
Facsimile: (303) 534-4618
10 | Attorneys for Plaintiff



## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

LORD ABBETT MUNICIPAL INCOME FUND, INC., a Maryland Corporation, on behalf of its series LORD ABBETT HIGH YIELD MUNICIPAL BOND FUND, LORD ABBETT NATIONAL TAX-FREE INCOME FUND and LORD ABBETT CALIFORNIA TAX-FREE INCOME FUND,

Plaintiff,

v.

JOANN ASAMI, R. THOMAS BEACH, NATASHA BEERY, JANE BREYER, JENNIFER LOWE CAMPBELL, OREN CHEYETTE, SARAH CLUGG, ORPHEUS CRUTCHFIELD, LYNN DE JONGHE, ROZ HAMAR, NATALIE LENZ-ACUNA, TIM MOPPIN, GINA MORELAND, JOANNE RUBIO, JENNIFER CURRY VILLENEUVE, ANDREW WEILL, VALERIE MCCANN WOODSON,

Defendants.

Case No. C12-03694

**COMPLAINT AND JURY DEMAND**

---

1

COMPLAINT AND JURY DEMAND

Plaintiff Lord Abbett Municipal Income Fund, Inc., a Maryland corporation, on behalf of its series Lord Abbett High Yield Municipal Bond Fund, Lord Abbett National Tax-Free Income Fund and Lord Abbett California Tax-Free Income Fund, for its Complaint against Defendants JoAnn Asami, R. Thomas Beach, Natasha Beery, Jane Breyer, Jennifer Lowe Campbell, Oren Cheyette, Sarah Clugg, Orpheus Crutchfield, Lynn De Jonghe, Roz Hamar, Natalie Lenz-Acuna, Jon McPherson, Tim Moppin, Gina Moreland. Joanne Rubio, Jennifer Curry Villaneuve, Andrew Weill, and Valerie McCann Woodson, states and alleges as follows:

## JURISDICTION AND VENUE

1. Lord Abbett High Yield Municipal Bond Fund ("Lord Abbett High Yield (MD)" or "High Yield") is a series of the Lord Abbett Municipal Income Fund, Inc., a Maryland corporation, and municipal bond mutual fund. At all times pertinent to this Complaint, Lord Abbett High Yield (MD) maintained its principal place of business in Jersey City, New Jersey. Lord Abbett High Yield (MD) is the successor-in-interest to the Lord Abbett High Yield Municipal Bond Fund, a series of the Lord Abbett Municipal Income Trust, a Delaware Statutory Trust ("Lord Abbett High Yield (DE)") through Lord Abbett High Yield (MD)'s acquisition of the assets of Lord Abbett High Yield (DE) on or about November 19, 2010. Lord Abbett High Yield (DE) purchased $7,225,000 in face value of the Bonds that are the subject of this Complaint. Lord Abbett High Yield (MD)'s acquisition of the assets of Lord Abbett High Yield (DE) included the acquisition of any claims of Lord Abbett High Yield (DE) as alleged herein. Thus, Lord Abbett High Yield (MD) stands in the shoes of Lord Abbett High Yield (DE) with respect to such claims.

2. Lord Abbett National Tax-Free Income Fund ("Lord Abbett Tax Free" or "Tax Free") is a series of the Lord Abbett Municipal Income Fund, Inc., a Maryland corporation, and municipal bond mutual fund. At all times pertinent to this Complaint, Lord Abbett Tax Free maintained its principal place of business in Jersey City, New Jersey. Lord Abbett Tax Free purchased $1,000,000.00 in face value of the Bonds that are the subject of this Complaint.

3. Lord Abbett California Tax-Free Income Fund ("Lord Abbett California Tax Free" or "California Tax Free") is a series of the Lord Abbett Municipal Income Fund, Inc., a Maryland corporation, and municipal bond mutual fund. At all times pertinent to this Complaint,

2
COMPLAINT AND JURY DEMAND

Lord Abbett California Tax Free maintained its principal place of business in Jersey City, New Jersey. Lord Abbett California Tax Free purchased $1,250,000.00 in face value of the Bonds that are the subject of this Complaint. Lord Abbett High Yield (MD) (in its own right and as the successor-in-interest to Lord Abbett High Yield (DE)), Lord Abbett Tax Free and Lord Abbett California Tax Free are collectively referred to as "Lord Abbett" throughout this Complaint.

4. At all times relevant to this action, Defendant JoAnn Asami was a resident of Berkeley, in Alameda County, California, and served as a member of the Board of Trustees of Windrush School ("Windrush"), a private school and federal 501(c)(3) organization located in El Cerrito, California.

5. At all times relevant to this action, Defendant R. Thomas Beach was a resident of Kensington, in Contra Costa County, California, and served as a member of the Board of Trustees of Windrush.

6. At all times relevant to this action, Defendant Natasha Beery was a resident of Berkeley, in Alameda County, California, and served as a member of the Board of Trustees of Windrush.

7. At all times relevant to this action, Defendant Jane Breyer was a resident of El Cerrito, in Contra Costa County, California, and served as a member of the Board of Trustees of Windrush.

8. At all times relevant to this action, Defendant Jennifer Lowe Campbell was a resident of Berkeley, in Alameda County, California, and served as a member of the Board of Trustees of Windrush.

9. At all times relevant to this action, Defendant Oren Cheyette was a resident of Berkeley, in Alameda County, California, and served as a member of the Board of Trustees of Windrush.

10. At all times relevant to this action, Defendant Sarah Cluff was a resident of Oakland, in Alameda County, California, and served as a member of the Board of Trustees of Windrush.

11. At all times relevant to this action, Defendant Orpheus Crutchfield was a

3

COMPLAINT AND JURY DEMAND

1 | resident of Berkeley, in Alameda County, California, and served as a member of the Board of Trustees of Windrush.

12. At all times relevant to this action, Defendant Lynn De Jonghe was a resident of Lafayette, in Contra Costa County, California, and served as a member of the Board of Trustees of Windrush.

13. At all times relevant to this action, Defendant Roz Hamar was a resident of Mill Valley, in Marin County, California, and served as a member of the Board of Trustees of Windrush.

14. At all times relevant to this action, Defendant Natalie Lenz-Acuna was a resident of Richmond, in Contra Costa County, California, and served as a member of the Board of Trustees of Windrush.

15. At all times relevant to this action, Defendant Tim Moppin was a resident of El Cerrito, in Contra Costa County, California, and served as a member of the Board of Trustees of Windrush.

16. At all times relevant to this action, Defendant Gina Moreland was a resident of Kensington, in Contra Costa County, California, and served as a member of the Board of Trustees of Windrush.

17. At all times relevant to this action, Defendant Joanne Rubio was a resident of El Sobrante, in Contra Costa County, California, and served as a member of the Board of Trustees of Windrush.

18. At all times relevant to this action, Defendant Jennifer Curry Villeneuve was a resident of Berkeley, in Alameda County, California, and served as a member of the Board of Trustees of Windrush.

19. At all times relevant to this action, Defendant Andrew Weill was a resident of El Cerrito, in Contra Costa County, California, and served as a member of the Board of Trustees of Windrush.

20. At all times relevant to this action, Defendant Valerie McCann Woodson was a resident of El Cerrito, in Contra Costa County, California, and served as a member of the Board

of Trustees of Windrush. The above-listed Defendants are collectively referred to as "Defendants."

21. Venue of this action lies in this Court pursuant to 28 U.S.C. § 1391(b) because all defendants are residents of the State in which the District is located, a substantial part of the events or omissions giving rise to the claims occurred in this District, and the property that is the subject of this action is located in this District.

22. Jurisdiction exists by virtue of diversity of citizenship pursuant to 28 U.S.C. § 1332 as the matter and controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

23. Assignment to the Oakland Division of this Court is proper pursuant to Civil Local Rule 3-2(c) and (d) because a substantial part of the events or omissions that give rise to the claim occurred in Contra Costa County.

## GENERAL ALLEGATIONS

**Introduction**

24. In July 2007, the California Statewide Communities Development Authority (the "Authority") issued $13,000,000 in par value of California Statewide Communities Development Authority Revenue Bonds (Windrush School) Series 2007 (the "Bonds") pursuant to a prospectus called a Preliminary Official Statement and Official Statement ("OS"). The Bonds were issued to finance and refinance the costs of replacement of an existing one-story classroom wing and to build a new two-story addition to Windrush School ("Windrush"), a private K-8 school, located in the town of El Cerrito, California. The Bonds were secured by a mortgage on the Windrush facility and were to be repaid from the payment of tuition by and on behalf of students attending Windrush, as well as other revenues such as gifts and grants.

25. The Authority, acting on behalf of Windrush, hired Stone & Youngberg ("S&Y"), a San Francisco based broker-dealer and investment banking firm, to serve as the underwriter of the Bonds. As underwriter, S&Y prepared the OS and offered and sold the Bonds to investors, including Lord Abbett, in the initial public distribution pursuant to the representations contained in the OS.

26. As a securities disclosure document, the OS was required to complete by and

accurately disclose of all material facts. The Authority was a conduit issuer acting on behalf of Windrush and did not have any active involvement in determining whether the OS made complete and accurate disclosure of all material facts. The Authority loaned the proceeds from the issuance of the Bonds to Windrush.

27. As the borrower of the Bond proceeds, Windrush was an obligated person, defacto issuer of the Bonds and a defacto offeror and seller of the Bonds. As such, Windrush had a duty to take reasonable action to ensure the OS contained complete and accurate disclosure of all material facts. All actions of Windrush in connection with the preparation of the OS were taken at the direction and with the approval of Defendants, acting in their role as members of the Board of Trustees of Windrush.

28. Each of the Defendants, as members of the Board of Trustees of Windrush, had a duty to exercise oversight with respect to the participation of Windrush in the preparation of the OS and, at a minimum, had a duty to ensure that the OS contained complete and accurate disclosure of all material facts that the Defendants, either individually or collectively, were aware of and knew would or could have a material negative impact on the ability of Windrush to generate the enrollment and tuition levels needed to repay the Bonds.

29. The OS represented that Windrush competed with public and private elementary and middle schools and projected that enrollment could reasonably be expected to increase from 241 students in 2006 to 320 students by 2013. Tuition was projected to increase from $14,400 for elementary students to $22,763 and from $16,600 for middle school students to $26,119. As a result, any fact that indicated Windrush would not be able to achieve its enrollment or tuition goals was material and had to be disclosed to potential bond purchasers in the OS.

30. Each of the Defendants had a special relationship with investors in the Bonds, including Lord Abbett, with respect to oversight of Windrush in connection with the preparation of the OS and had a duty to take reasonable action to ensure the OS contained complete and accurate disclosure of, at a minimum, all material facts the Defendants were aware impacted the ability of Windrush to increase its enrollment and tuition.

31. Making Waves Foundation ("Making Waves") is a well-known and

6
COMPLAINT AND JURY DEMAND

respected Bay Area 501(3)(c) charitable organization which, as of 2007, had a long history of placing low-income students in area schools with tuition assistance. Until the 2007 school year, Making Waves had a history of providing approximately 10 to 15 sixth, seventh and eighth grade middle school students to Windrush each year along with a tuition subsidy of approximately $10,000 per student. Windrush typically had approximately forty middle school students placed by Making Waves enrolled in Windrush during the school years preceding the issuance of the Bonds.

32. Before July 2007, Making Waves announced it would build its own school approximately five miles from Windrush and would stop referring middle school students to Windrush. Making Waves was expected to and did, in fact, open in 2007, shortly after the Bonds were issued.

33. At the time the Bonds were issued in July 2007, Windrush and each of the Defendants was aware that Making Waves would stop referring middle school students to Windrush after the 2007-2008 school year and was aware of the fact that the loss of the Making Waves referrals and the loss of substantial tuition assistance would create serious and ongoing financial problems for Windrush that would make it highly unlikely that Windrush would ever be able to repay the Bonds.

34. Each of the Defendants acting both individually and collectively and acting with the want of even scant care and with an extreme departure from the ordinary standard of conduct, negligently failed to disclose Windrush would lose the Making Waves student referrals and the substantial Making Waves tuition assistance payments beginning with the 2008-2009 school year and failed to disclose that Making Waves would become a competitor of Windrush that had a superior endowment base and, as a charter school, would receive state aid payments to supplement its endowments. Each of the Defendants knew that, as a private school, Windrush did not receive state aid payments.

35. Each of the Defendants, in connection with their position as a member of the Board of Trustees of Windrush, was aware during their tenure on the Board that Windrush had an obligation to continue to make disclosure with respect to the economic viability of the school to the municipal bond marketplace after the Bonds were issued and were aware of the fact that Windrush

7
COMPLAINT AND JURY DEMAND

continued to fail to disclose the above alleged facts after the Bonds were issued. Lord Abbett reasonably relied upon the OS when making investment decisions with respect to the Bonds and collectively purchased $3,250,000.00 million in face value of the Bonds in July 2007 as part of the initial public distribution of the Bonds. Lord Abbett later purchased an additional $6,250,000 in face value of the Bonds in early 2010 in reliance on the OS and the misleading continuing disclosure provided to the marketplace by Windrush.

36. Lord Abbett was not aware that Making Waves had historically placed students at Windrush with substantive tuition assistance payments or that Making Waves would soon open its own charter school academy in Windrush's market area. Lord Abbett was not aware that without the Making Waves students and tuition payments, Windrush would be unable to meet the enrollment and revenue projections contained in the OS. Lord Abbett was not aware of the fact that Making Waves Academy would soon become a competitor of Windrush with superior endowments and was unaware that, unlike Windrush, Making Waves Academy would be a charter school that received public funding. Lord Abbett would not have purchased the Bonds if it had been aware of the true facts.

37. In July 2011, Windrush announced that it did not have sufficient revenue to pay the $357,500 interest payment that was due on July 1, 2011. Windrush then entered into bankruptcy proceedings and closed its doors on June 30, 2012. Wells Fargo, as trustee for bondholders including Lord Abbett, is now in possession of the school building, which is worth far less than the par value of the Bonds purchased by Lord Abbett.

## FACTUAL BACKGROUND

**Windrush Decides to Expand.**

38. Windrush was established in 1976 as an early elementary program and became a 501(c)(3) nonprofit corporation in 1984. In 2007, the School was in its 30th year of operation in the East San Francisco Bay Area.

39. In 2007, at a time when Windrush should have been consolidating in light of the developments at Making Waves, Windrush sought to replace an existing one-story classroom wing in front of Windrush's existing gymnasium. In addition, Windrush sought to add a new two-

COMPLAINT AND JURY DEMAND

story 13,500 square foot addition in the same location for purposes of providing an interim library, seven new classrooms, and supporting circulation area that would include a new lobby for the gymnasium.

40. To fund the expansion, the Defendants authorized Windrush to seek financing through the issuance of bonds.

41. The Authority, acting solely as a conduit issuer, agreed to issue the Bonds on behalf of Windrush and loan the proceeds to Windrush.

**On a historic basis, windrush had received a substantial number of students and tuition payments from making waves.**

42. Making Waves historically placed about 10 to 15 middle school students at Windrush each year and provided Windrush with tuition payments of about $10,000 per student. At any given point through the 2007 school year Windrush would have about 30 to 40 middle school students enrolled at Windrush who had been placed at Windrush by Making Waves and Windrush received substantial tuition payments from Making Waves to support each of those students.

43. Each of the Defendants, as members of the Board of Trustees of Windrush, was aware that Making Waves' continued placement of students at Windrush was of critical importance to the continued economic viability of the school.

44. Each of the Defendants, as members of the Board of Trustees of Windrush, was aware that Windrush received about 10-15 new students each year from Making Waves with a per student tuition subsidy of about $10,000 each year.

**Defendants were aware that Making Waves would be opening its own charter school academy and would compete with Windrush.**

45. Prior to the issuance of the Bonds in July 2007, Windrush and each of the Defendants, in their role as members of the Board of Trustees, were notified that Making Waves would open its own charter school called Making Waves Academy, in Richmond, California, about five miles from Windrush in the same market area.

46. Prior to the issuance of the Bonds in July 2007, Windrush and each of the

9
COMPLAINT AND JURY DEMAND

Defendants, in their role as members of the Board of Trustees, were also notified that the 2007-08 school-year was the last year in which Windrush would receive any new students from Making Waves Foundation.

47. With this information, Windrush and each of the Defendants, in their role as members of the Board of Trustees, knew that after the 2007 school year Windrush would lose its most consistent source of enrollment and would, between the 2008 and 2010 school years, lose all of the tuition revenue payments from Making Waves as a result of graduations and the fact that Making Waves would no longer be referring about 10 to 15 middle school students to Windrush each year.

**Defendants failed to disclose any of the material facts regarding Making Waves academy.**

48. Prospective purchasers of the Bonds, including Lord Abbett, were provided an OS, which included detailed enrollment and revenue projections, as well as information concerning other schools in the East Bay area that competed with Windrush for students.

49. The Defendants, acting in their role as members of the Board of Trustees of Windrush, approved and authorized the enrollment projections, revenue projections and competitor school information included in the OS.

50. Windrush represented in the OS that the new building would allow Windrush to increase enrollment from 260 to 347 students and to even out its grade configuration to two classes at every grade level.

51. Windrush projected that enrollment could reasonably be expected to increase from 241 students in 2006-07 to 320 students in 2013-14. Windrush also projected substantial increases in revenue each year from increased enrollment and planned yearly tuition increases.

52. Based on Defendants' enrollment and revenue projections, the OS projected Windrush would generate sufficient revenue each year to satisfy its expenses, including payments on the Bonds.

53. The termination of the above alleged Making Waves student referral program and the fact that Making Waves Academy would, after 2007, become a better endowed charter school competitor to Windrush made it likely that Windrush would lose enrollment and

COMPLAINT AND JURY DEMAND

suffer a substantial decline in revenue that would, in turn, make it extremely unlikely that Windrush would be able to pay the Bonds.

54. The OS failed to disclose that Making Waves Academy would open shortly after the Bonds were issued and would be a new, better endowed, charter school competitor to Windrush.

55. The OS failed to disclose the above alleged facts regarding the termination of the Making Waves student referral program.

56. Each of the Defendants, acting in their role as members of the Board of Trustees, of Windrush had knowledge of the above alleged facts regarding Making Waves Academy and the termination of the Making Waves student referral program and knew the enrollment and revenue projections in the OS were unattainable.

57. Each of the Defendants, in their role as members of the Board of Trustees, was aware of the representations made in the OS and of the failure to disclose the above facts. Each of the Defendants, in their role as members of the Board of Trustees, acting with knowledge of the above-alleged facts, owed a special duty to members of the investing public, including Lord Abbett, to ensure that the OS contained complete and accurate disclosure of the above alleged material facts.

58. Each of the Defendants, in their role as members of the Board of Trustees, acting with knowledge of the above-alleged facts, acted with the want of even scant care and in an extreme departure from the ordinary standard of conduct by failing to require Windrush to disclose the above alleged material facts in the OS.

59. The enrollment and revenue projections in the OS were intended to affect and induce members of the investing public to purchase the Bonds. It was foreseeable to the Defendants that inaccurate and incomplete disclosure of material facts in the OS would cause harm to purchasers of the Bonds.

**Lord Abbett Purchased the Bonds in Reliance Upon the Enrollment and Revenue Projections Set Forth in the OS.**

60. On August 15, 2007, February 1, 2010 and April 30, 2010 Lord Abbett

11
COMPLAINT AND JURY DEMAND

purchased the Bonds in an aggregate par amount of approximately 9.475 million dollars. Lord Abbett purchased the Bonds in reasonable reliance upon the representations set forth in the OS and the continuing disclosure made by Windrush after the Bonds were issued.

61. Had Lord Abbett known the true facts, it would not have purchased the Bonds.

62. Lord Abbett purchased the Bonds as follows in the initial public distribution:

| Fund | Settlement Date | Amount Purchased |
|---|---|---|
| Tax Free | 08/15/07 | 1,000,000.00 |
| California Tax Free | 08/15/07 | 1,250,000.00 |
| High Yield | 08/15/07 | 1,000,000.00 |

63. As an obligated person and as the borrower of the proceeds from the Bonds, Windrush was required by regulation to make complete and accurate continuing disclosure to the municipal bond marketplace after the Bonds were issued regarding the source of any material financial problems encountered by the school.

64. Competition from the new Making Waves Academy and the termination of the Making Waves student referral program was the source of and resulted in substantially reduced enrollment and revenues at Windrush.

65. Each of the Defendants, acting in their role as members of the Board of Trustees of Windrush, during their tenure as board members, were aware of the requirements of the Continuing Disclosure Agreement between Windrush and the Authority and were aware of Windrush's ongoing duty to disclose the above-alleged facts regarding the new Making Waves Academy and the termination of the Making Waves student referral program.

66. Each of the Defendants, acting in their role as members of the Board of Trustees, during their tenure as board members, knew Windrush was continuing to conceal the above-alleged facts and was continuing to fail to take any action to ensure that complete and accurate disclosure of said facts was made to the market.

67. Each of the Defendants, acting in their role as members of the Board of

Trustees, during their tenure as board members, acted with the want of even scant care and in an extreme departure from the ordinary standard of conduct by failing to require that Windrush make complete and accurate disclosure of said facts to the marketplace.

68. Each of the Defendants, acting in their role as members of the Board of Trustees, knew that there would potentially be a secondary market for the Bonds, knew that the market would continue to rely upon the representations in the OS, would rely on the continuing disclosure provided by Windrush and would continue to be misled by the failure of Windrush to disclose the above-alleged facts.

69. In reliance upon the OS as supplemented by the misleading continuing disclosure provided by Windrush, Lord Abbett purchased additional Bonds as follows:

70.

| High Yield | 02/01/10 | 3,250,000 |
| High Yield | 02/01/10 | 1,000,000 |
| High Yield | 04/30/10 | 2,000,000 |

71. Had Lord Abbett known the true facts it would not have purchased the Bonds in the secondary market.

72. The Bonds have now defaulted and Lord Abbett has suffered damages as a direct and proximate result of the Defendants' above alleged actions and failure to cause Windrush to disclose the above alleged material facts regarding Making Waves Academy and the termination of the Making Waves student referral program.

73. Acting with reasonable care and diligence, Lord Abbett first discovered the above-alleged facts regarding Making Waves Academy and the termination of the Making Waves student referral program in July 2012. Windrush and its Board of Trustees actively misled Lord Abbett with respect to said material facts from July 2007 until 2012.

///

///

13
COMPLAINT AND JURY DEMAND

## FIRST CLAIM FOR RELIEF
### (Negligent Misrepresentation)

74. Lord Abbett repeats the allegations of all preceding paragraphs of this Complaint and incorporates the same by reference.

75. Defendants had a duty to disclose or cause to be disclosed to potential purchasers of the Bonds, including Lord Abbett, the material facts set forth above. Defendants had a duty to take reasonable actions to ensure that the representations made in the OS were truthful and not misleading.

76. Defendants breached their duty to Lord Abbett by making the misrepresentations of material facts and failing to disclose material facts as set forth hereinabove.

77. Defendants made the representations with the intent to induce Lord Abbett to purchase the Bonds.

78. Lord Abbett, unaware of the falsity of Defendants' representations, took action in reliance upon the misrepresentations and failures to disclose of Defendants.

79. Defendants knew that the information in the OS would be relied upon by Lord Abbett.

80. As a direct and proximate result of the misrepresentations and omissions of Defendants, Lord Abbett has suffered damages.

## RELIEF REQUESTED

Lord Abbett requests that the Court enter judgment in favor of the Lord Abbett, and against the Defendants, and each of them, jointly and severally, on Lord Abbett's Claim for Relief and award Lord Abbett:

    a. Out-of-pocket damages;
    b. Prejudgment interest;
    c. Costs;
    d. Any other relief which the Court deems proper.

///
///
///

Dated: July 13, 2012

GOODIN, MACBRIDE, SQUERI,
DAY & LAMPREY, LLP

DAVIS & CERIANI, P.C.

By: _____
Francine T. Radford
Attorneys for Plaintiffs
LORD ABBETT MUNICIPAL INCOME
FUND, INC., a Maryland Corporation, on
behalf of its series LORD ABBETT HIGH
YIELD MUNICIPAL BOND FUND,
LORD ABBETT NATIONAL TAX-FREE
INCOME FUND and LORD ABBETT
CALIFORNIA TAX-FREE INCOME
FUND

## DEMAND FOR JURY TRIAL

Lord Abbett hereby demands a jury trial with respect to its Complaint.

Dated: July 13, 2012

GOODIN, MACBRIDE, SQUERI,
DAY & LAMPREY, LLP

DAVIS & CERIANI, P.C.

By: _____
Francine T. Radford
Attorneys for Plaintiffs
LORD ABBETT MUNICIPAL INCOME
FUND, INC., a Maryland Corporation, on
behalf of its series LORD ABBETT HIGH
YIELD MUNICIPAL BOND FUND,
LORD ABBETT NATIONAL TAX-FREE
INCOME FUND and LORD ABBETT
CALIFORNIA TAX-FREE INCOME
FUND

2329/001/X142663.v1