**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10

11   LORD   ABBETT   MUNICIPAL   INCOME        No. C-12-03694 DMR
     FUND, INC., *et al*,
12                                             **ORDER ON DEFENDANTS' MOTIONS**
                    Plaintiffs,               **FOR SUMMARY JUDGMENT**
13                                             **[DOCKET NOS. 115, 124]**
          v.
14
     JOANN ASAMI, *et al.*,
15
                    Defendants.
16   _____/

17   LORD   ABBETT   MUNICIPAL   INCOME
     FUND, INC., *et al.*,
18
                    Plaintiff,
19
          v.
20
     STONE & YOUNGBERG LLC,
21
                    Defendant.
22   _____/

23        In 2007 and 2010, Plaintiff Lord Abbett Municipal Income Fund, Inc., on behalf of its series

24   Lord Abbett High Yield Municipal Bond Fund, Lord Abbett National Tax-Free Income Fund, and

25   Lord Abbett California Tax-Free Income Fund ("Lord Abbett"), purchased a total of $9.5 million of

26   tax-exempt municipal bonds issued by the California Statewide Communities Development

27   Authority ("CSCDA") on behalf of Windrush School ("Windrush"), a private K-8 school in El

28

**United States District Court**
For the Northern District of California

1  Cerrito, California.  In 2011, after failing to make an interest payment on the bonds, Windrush filed

2  for bankruptcy and the school closed in 2012.

3      In this litigation, Lord Abbett sues Defendants Joann Asami, Thomas Beach, Jane Breyer,

4  Jennifer Campbell, Oren Cheyette, Lynn De Jonghe, Roz Hamar, Tim Moppin, Gina Moreland,

5  Jennifer Villeneuve, and Valerie McCann Woodson (the "Board Member Defendants") for negligent

6  misrepresentations allegedly made by them in the July 17, 2007 Preliminary Limited Offering

7  Memorandum ("PLOM") for the bonds.  The Board Member Defendants were all members of the

8  Windrush Board of Trustees when CSCDA issued the Windrush School bonds in 2007.

9      Lord Abbett also filed a lawsuit in New Jersey against broker-dealer Stone & Youngberg

10  LLC ("Stone & Youngberg") for negligent misrepresentation and violation of California and New

11  Jersey securities laws in connection with the bond issuance.  The United States District Court for the

12  District of New Jersey transferred that action to this District in December 2012.  In February 2013

13  the court consolidated the matter with the action against the Board Member Defendants.  [Docket

14  No. 50.]

15      The Board Member Defendants and Stone & Youngberg each now move pursuant to Federal

16  Rule of Civil Procedure 56 for summary judgment or, in the alternative, partial summary judgment.

17  [Docket Nos. 115 ("S&Y's Mot."), 124 ("Bd. Defs.' Mot.").]  Lord Abbett filed an omnibus

18  opposition to both motions.  [Docket No. 153 ("Pl.'s Opp'n").]  The court held a hearing on the

19  motions on June 26, 2014.  For the following reasons, the court grants the Board Member

20  Defendants' motion and grants in part Stone & Youngberg's motion.

21                          **I.  Facts and Background**

22      Windrush, a non-profit progressive private school, was founded in 1976.  A Board of

23  Trustees, consisting of several volunteers and the Head of School ("the Board"), governed the

24  school.  Defendant De Jonghe served as the Head of School and was a board member from 1998

25  until June 30, 2007.

26      In 2006 or 2007, as part of its strategic plan, the school decided to build a new addition.  It

27  consulted Stone & Youngberg investment banker Dirk ten Grotenhuis for assistance in obtaining

28  tax-exempt municipal bond financing to fund the project.  Because Windrush was not a government

**United States District Court**
For the Northern District of California

1  organization, in order for the bonds to have tax-exempt status, the school was required to issue

2  bonds through the CSCDA, which would act as a conduit issuer that loaned the bond proceeds to

3  Windrush.  In accordance with regulations, the Windrush bonds could only be sold to "approved

4  institutional buyers," defined as "institutional investors that own and invest on a discretionary basis

5  at least $100 million in securities."  (Grotenhuis Decl. ¶ 4.)  Grotenhuis was the primary investment

6  banker assisting Windrush with the bond issuance, along with bond disclosure counsel Hawkins

7  Delafield & Wood LLP ("Hawkins Delafield").

8        In May 2007, the Board passed a resolution authorizing Windrush to issue the bonds.  The

9  resolution authorized the Chair (Defendant Beach); Treasurer (Defendant Cheyette); Secretary

10  (Defendant Campbell); Head of School (Defendant De Jonghe); or Director of Finance and

11  Operations ("DFO") (Bonnie Whitler) to "conclude negotiations of the terms of the Bond Financing

12  and to execute and deliver" the necessary documents on behalf of Windrush.[1]  (Beach Decl., Apr.

13  29, 2014, Ex. 38.).  All of the Board Member Defendants were on the Board at the time the bond

14  resolution passed.  Hawkins Delafield had primary responsibility for drafting the PLOM as well as

15  the final Limited Offering Memorandum for the bonds, using information provided by Windrush.

16        In April 2007, Stone & Youngberg and Hawkins Delafield provided Whitler with a template

17  for the PLOM.  Whitler worked with the Board of Trustees to compile the necessary information for

18  the PLOM.  All of the Board Member Defendants contributed biographical information about

19  themselves.  In addition, as a member of the Board's finance committee, Defendant Cheyette worked

20  on "financial models" using data provided by Windrush, some of which was incorporated into an

21  unspecified portion of the PLOM.  Cheyette reviewed and commented on drafts, adjusting his

22  financial projections in the process, but did not otherwise draft or revise the language of the PLOM.

23  De Jonghe worked on a number of sections of early drafts, including a section on student enrollment

---

24

25        [1]  Whitler, who was never a board member and is not a defendant in these actions, was the
school's DFO from 1993 until May 2010.  It is undisputed that Whitler acted as the school's point
26  person in developing the PLOM, reviewing all of the revenue, tuition, enrollment, attrition, fundraising
and financial aid information that was used in the PLOM, and working with Stone & Youngberg and
27  Hawkins Delafield to prepare the bond documents.  There is no evidence that Defendants Beach,
Cheyette or De Jonghe took any actions under the authority vested in them through the Board resolution.
28  In other words, the record does not indicate that any of them were involved in negotiating the  terms of
the bonds, or executing and delivering the documents supporting the bonds.

United States District Court

For the Northern District of California

history and projections.  However, her involvement with the bond issuance and the PLOM stopped on June 30, 2007 when her employment and term on the Board ended.  Beach reviewed drafts of the PLOM and provided comments but did not draft or revise any of the language.  Other than providing biographical information, Defendants Asami, Breyer, Campbell, Hamar, Moppin, Moreland, Villeneuve, and Woodson were not involved in drafting or revising the PLOM.  The PLOM was not submitted to the Board as a whole for approval or a vote, although a draft may have been distributed to board members by email.

On July 18, 2007, prior to the issuance of the bonds, Stone & Youngberg salesperson Rich Beames emailed an unsigned version of the PLOM dated July 17, 2007 to Lord Abbett portfolio managers.  The PLOM stated that the bonds were not rated and provided various warnings or "cautionary statements regarding forward-looking statements":

> THE ACHIEVEMENT OF CERTAIN RESULTS OR OTHER EXPECTATIONS CONTAINED IN SUCH FORWARD-LOOKING STATEMENTS INVOLVE KNOWN AND UNKNOWN RISKS, UNCERTAINTIES AND OTHER FACTORS WHICH MAY CAUSE ACTUAL RESULTS, PERFORMANCE OR ACHIEVEMENTS DESCRIBED TO BE MATERIALLY DIFFERENT FROM ANY FUTURE RESULTS, PERFORMANCE OR ACHIEVEMENTS EXPRESSED OR IMPLIED BY SUCH FORWARD-LOOKING STATEMENTS.

(July 17, 2007 PLOM at LA_WINDRUSH_005088.)  The PLOM also noted that there would be no "updates or revisions" to forward-looking statements.  (July 17, 2007 PLOM at LA_WINDRUSH_005088.)  Table 9 in the PLOM included projected tuition increases, tuition revenues, fundraising revenues, operating expenses, and other projected information.  It also contained projections for "Total enrollment per actual, budget or expansion projections" for the school years 2006-07 through 2013-14.  Enrollment was projected to increase by nineteen students from the 2006-07 school year (241 students) to the 2007-08 school year (260 students), and to increase by ten students each school year thereafter.  (July 17, 2007 PLOM at 44.)  The page immediately preceding Table 9 contained a statement that the projections that followed were not "a guarantee of future performance" and directed the reader to its "cautionary statements regarding forward looking statements."  (July 17, 2007 PLOM at 43.)

**United States District Court**
For the Northern District of California

At the core of this lawsuit is the fact that the PLOM contained no mention of Making Waves, a Bay Area foundation supporting low-income students.  Making Waves was a significant source of students and tuition for Windrush.  As described by De Jonghe in Windrush's September 2006 Annual Report, Making Waves offered tutoring services, helped students apply to private schools, and helped with tuition assistance.  Making Waves began providing tuition assistance for students to attend Windrush in the 2002-03 school year by assisting four seventh grade students.  By the 2006-07 school year, 24 Making Waves students attended Windrush in its sixth, seventh, and eighth grade classes.  Both Windrush and Making Waves provided financial aid for Making Waves students; De Jonghe noted in the Annual Report that in the 2005-06 school year, "the Making Waves Foundation contributed $301,450 in tuition funding for its students at Windrush, making it the most effective fundraising program for the school."  (2006 Annual Report at 15.)

However, at some point before the bonds were issued, Making Waves announced that it was planning on opening its own charter school, Making Waves Academy.  Making Waves planned to begin its school with a class of fifth graders only, and would continue to place sixth graders in other schools in the 2007-2008 school year.  The following year, Making Waves planned to stop placing sixth graders at other schools, although it would continue to provide tuition assistance for the seventh and eighth graders it had already placed.  Making Waves Academy eventually opened in the fall of 2007.  It is undisputed that by September 2006, all of the Board Member Defendants were aware that Making Waves would cease being a source of students and tuition after it opened its own school (the "Making Waves facts").[2]  The Making Waves facts were not included in the July 17, 2007 PLOM.

On July 20, 2007, Lord Abbett research analyst Joe Gulli emailed Beames at Stone & Youngberg with several bond-related questions, which Stone & Youngberg answered.  Stone & Youngberg subsequently priced the bonds, and on August 15, 2007, Lord Abbett, as an approved institutional buyer, purchased $3.25 million of the bonds in the initial offering.  Six other institutional buyers also purchased the bonds.  Lord Abbett admits that it knew at the time of the

---

[2] Whether Stone & Youngberg was aware of the Making Waves facts prior to the 2007 bond issuance is a disputed fact that is not relevant for purposes of these motions.

United States District Court

For the Northern District of California

purchase that the bonds were not rated, and that it gave the bonds an internal rating of "BB," which meant that they were below investment grade.[3]

Lord Abbett and Stone & Youngberg dispute Stone & Youngberg's role in the 2007 sale of the bonds.  Lord Abbett contends that Stone & Youngberg offered and sold the bonds to Lord Abbett as an underwriter, while Stone & Youngberg contends that it was a placement agent for the bonds and never purchased or owned the bonds (*see* discussion below).

In connection with the bond issuance, Windrush entered into a Continuing Disclosure Agreement ("CDA") with Wells Fargo Bank, N.A. ("Wells Fargo") as trustee for the bonds in which Windrush agreed to provide to Wells Fargo with annual audited financial reports, including information about admissions, enrollment, and tuition.  However, as the bonds were only sold to approved institutional buyers and were sold in units of $100,000 or larger, the bonds were exempt from the requirements of SEC Rule 15c2-12, which requires parties to provide certain annual financial information to the Municipal Securities Rulemaking Board.  Therefore, Stone & Youngberg asserts that it had no duty to provide any continuing disclosures with respect to the bonds.

In January 2008, pursuant to the CDA, Windrush's June 2007 audited financial statement became available through Nationally Recognized Municipal Securities Information Repositories ("NRMSIRs"), which include services such as Bloomberg.  The financial statement reported that Windrush's current enrollment was 257 students.  Seven months later, in July 2008, Stone & Youngberg salesperson Joe Cushing and a representative of one of the bondholders (not Lord Abbett) visited Windrush.  Following his visit, Cushing reported to Stone & Youngberg research analyst Lauren Post that enrollment for the 2008-09 school year was down, and that one of the reasons for the decline was the loss of a single source of students.  Following Cushing's visit, Post followed up with Windrush and learned about the loss of the Making Waves students.  Stone &

---

[3] According to a document titled "Lord Abbett's Internal Rating Methodology for Private Higher Education (Rated and Non-Rated Securities)," an obligation rated "BB" is "less vulnerable to near-term nonpayment than other speculative issues.  However, it faces major ongoing uncertainties or exposure to adverse business, financial, or economic conditions, which could lead to the obligor's inadequate capacity to meet its financial commitment on the obligation."  (Catalona Decl. Ex 27 at 4.)

United States District Court
For the Northern District of California

Youngberg subsequently coordinated an investor call between Windrush and the bondholders that was to take place on September 12, 2008.  On September 10, 2008, Beames forwarded an email invitation to participate in the investor call to Lord Abbett portfolio managers Daniel Solender and Scott Smith.  In the email invitation, Post wrote, "Bonnie Whitler, Director of Finance and Operations for Windrush School, will be available to answer investor questions about the school on a conference call . . . Bonnie [and Head of School Ilana Kaufman] . . . will answer questions about the facility, enrollment, tuition, budget, fundraising, and any other topics of interest to the 2007 bond holders." (Jaskowiak Decl. Ex. X.)  Solender forwarded the email to Lord Abbett research analyst Gulli the same day.

According to Stone & Youngberg's internal notes, Windrush informed investors on the call that enrollment had decreased from 260 students in 2007-08 (the number projected in the PLOM for that school year) to 232 in 2008-09, and that Making Waves had announced the opening of its new school in autumn 2007.  The notes indicated that the enrollment shortfall was attributed to 1) the loss of about 15 Making Waves students; 2) five families that were no longer able to afford private school; and 3) ten families that pulled their children out of the school due to other changes in circumstances.  (Holman Decl., April 16, 2014, ¶ 4 Ex. A.)

Despite receiving the invitation, Lord Abbett did not participate in the investor call.  Lord Abbett contends that Gulli requested a summary of the call in an email to Post on September 10, 2008, in which he asked, "Lauren, can the school produce that information in hard copy form?  That may eliminate or at least reduce some questions." (Jaskowiak Decl. Ex. GG.)  Gulli sent the email on the same day that Post emailed the invitation to the call; this timing suggests that Gulli was referring to the information that would be discussed on the call, but this is not clear as his email neither mentions the investor call nor was it a "reply" to the emailed invitation.  On September 12, 2008, the same day the call took place, Post replied to Gulli's email, stating that "[t]he school will make available the draft 2007/08 audit and revised 2008/09 budget after board approval in mid-October.  We'll send it to you, along with updated enrollment figures." (Jaskowiak Decl. Ex. GG.)  Stone & Youngberg asserts that Post did not construe Gulli's email as a request for a summary of the information disclosed in the call.  It submits a declaration by Post in which she states that she

**United States District Court**
For the Northern District of California

1    does not recall anyone from Lord Abbett contacting her to request a summary of the call, and that

2    had an investor contacted her to request a summary, she "would have read the [internal research

3    system] update to them over the telephone or sent them an email summary" of the update, which

4    contained the information about the loss of the Making Waves students.  (Post Decl., April 16, 2014,

5    ¶ 7.)  On October 28, 2008, Gulli again emailed Post to ask when he could expect to receive the

6    audit, budget, and enrollment numbers, to which she responded that she would find out and get back

7    to Gulli.  It is not clear whether or when Post ever responded to Gulli's request for information.

8         In December 2008, Windrush's June 2008 audited financial statement became available on

9    NRMSIRs.  The 2008 statement reported that enrollment was at 232 students, which was 25 fewer

10   than the previous year's enrollment as reported in the 2007 financial statement, and 28 less than the

11   enrollment projections in the PLOM.  In March 2009, Gulli updated Lord Abbett's internal research

12   on the bonds, relying in part on the 2008 financial statement.  In his update, Gulli stated that "the

13   rating and trend [for the bonds] reflect positive operations, improving fund balance, improving test

14   scores."  Inexplicably, Gulli also noted "limited enrollment gains," despite the fact that enrollment

15   was down from the PLOM's projection.  (Jaskowiak Decl. Ex. R at LA_WINDRUSH_002274

16   (emphasis added).)  Gulli's testimony regarding his March 2009 update is less than clear.  He first

17   testified that his statement about "limited enrollment gains" meant that enrollment had increased, but

18   by less than the projected amount.  (Gulli Dep. 149:11-16.)  He also testified that he never would

19   have stated "limited enrollment gains" if enrollment had actually decreased.  (Gulli Dep. 195:4-21.)

20   However, when informed that enrollment had in fact decreased, Gulli testified that he had expected

21   enrollment to decrease as a result of the construction of the new facility, and that the loss of students

22   amounted to "limited enrollment gains" because "they didn't have the gains that was expected."

23   (Gulli Dep. 198:9-199:19.)

24        On June 3, 2009, Lord Abbett portfolio manager Solender received a Bloomberg message

25   from another bondholder.  The Bloomberg message indicated that enrollment was at 232 students

26   (38 less than the 270 projected in the PLOM for the 2008-09 school year), and that the "Business

27   manager [was] projecting flat enrollment for 09/10 . . . and slight growth in 10/11."  (Jaskowiak

28   Decl. Ex. S at LA_WINDRUSH_001370.)  Windrush's June 2009 audited financial statement

**United States District Court**
For the Northern District of California

became publicly available on December 28, 2009.  The financial statement reported a negative cash flow of $1.95 million, a decrease in revenue from $4.5 million to $3.96 million, and an increase in expenses from $4.4 million to $5.6 million.  It did not set forth current enrollment numbers.

In January 2010, Lord Abbett made a discount purchase of an additional $4.225 million in face value of the bonds, for which it paid $3.27 million, or approximately 77 cents on the dollar.  In April 2010, Lord Abbett purchased an additional $2 million in face value of the bonds for approximately $1.6 million, or 78.3 cents on the dollar, bringing its total holdings of the bonds to $9.475 million in face value.  Lord Abbett admits that Windrush's 2008 and 2009 financial statements were available for its review when it purchased the bonds in January and April 2010.  Stone & Youngberg did not play a role in Lord Abbett's 2010 purchases of the Windrush bonds.

On June 30, 2010, Gulli requested financial and enrollment information from Windrush.  By August 1, 2010, after several emails, Gulli had not received a response.  Thereafter, for the first time since March 2009, Gulli updated Lord Abbett's internal research on the bonds and changed the bonds' rating from BB to "B+ with a declining trend."  (Jaskowiak Decl. Ex. R at LA_WINDRUSH_002150.)  He also wrote that "the rating reflects negative operations, insufficient debt service and the lack of disclosure" and stated that "the credit is a sell recommendation."  (Jaskowiak Decl. Ex. R at LA_WINDRUSH_002150.)  Lord Abbett admits that Gulli's reference to "negative operations" was based upon Windrush's June 2009 financial statement, and that his reference to "insufficient debt service" was based upon the 2009 financial statement, the July 17, 2007 PLOM, and the Limited Offering Memorandum.  (Jaskowiak Decl. Ex. C, Responses to Requests for Admission 7, 8.)  Therefore, the information that led to Gulli's August 2010 "sell recommendation" was based on data that was available to Lord Abbett as of December 2009, prior to its January and April 2010 bond purchases.  On August 6, 2010, Windrush provided Gulli with financial information and enrollment statistics that stated that enrollment had decreased to 208 for the 2010-11 school year.  Gulli updated Lord Abbett's internal research to include this information and the "sell recommendation" remained in place.

On July 1, 2011, Windrush failed to make its semiannual interest payment of $357,000, and on September 30, 2011, the school filed for Chapter 11 bankruptcy.  The school closed at the end of

the 2011-12 school year.  On July 10, 2012, after the school closed, counsel for Lord Abbett interviewed Enrico Hernandez, Windrush's former CFO, and learned of the Making Waves facts. On December 18, 2012, Trustee Wells Fargo paid the bondholders 100% of accrued interest and 39% of the principal.

## II.  Procedural History

Lord Abbett sued the Board Member Defendants on July 13, 2012, bringing a single claim for alleged negligent misrepresentations in the July 17, 2007 PLOM.  On May 1, 2014, the parties filed a stipulation dismissing five Board Member Defendants whose terms on the Board expired on June 30, 2007, prior to the issuance of the PLOM.  [Docket No. 123.]

On July 25, 2012, Lord Abbett sued Stone & Youngberg in the United States District Court for the District of New Jersey.  It brought claims for negligent misrepresentation and violation of New Jersey's Uniform Securities Law ("USL"), New Jersey Statute section 49:3-71(a)(2), and the California Corporate Securities Act, California Corporations Code sections 25401 and 25501.  Stone & Youngberg moved to dismiss the complaint for improper venue or, in the alternative, to transfer venue, and on November 19, 2012, the court granted Stone & Youngberg's motion to transfer and transferred this matter to this District.  In February 2013, this court consolidated the matter with the action against the Board Member Defendants.

The Board Member Defendants and Stone & Youngberg now each separately move for summary judgment or, in the alternative, partial summary judgment.

## III.  Legal Standard

A court shall grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the light most favorable to the non-movant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).  A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, sufficient evidence favors the non-movant such that a

1  reasonable jury could return a verdict in that party's favor. *Id.* at 248.  The court may not weigh the

2  evidence, assess the credibility of witnesses, or resolve issues of fact.  *See id.* at 249.

3       To defeat summary judgment once the moving part has met its burden, the nonmoving party

4  may not simply rely on the pleadings, but must produce significant probative evidence, by affidavit

5  or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that a genuine

6  issue of material fact exists.  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626,

7  630 (9th Cir. 1987).  In other words, there must exist more than "a scintilla of evidence" to support

8  the non-moving party's claims, *Anderson*, 477 U.S. at 252; conclusory assertions will not suffice.

9  *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  Similarly, "[w]hen

10 opposing parties tell two different stories, one of which is blatantly contradicted by the record, so

11 that no reasonable jury could believe it, a court should not adopt that version of the facts" when

12 ruling on the motion.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

**IV.  Discussion**

14      The Board Member Defendants and Stone & Youngberg each move for summary judgment

15 on multiple grounds.  The court will first address the Board Member Defendants' motion.

16 **A.       Board Member Defendants' Motion**

17      Lord Abbett does not sue Windrush, presumably because the school no longer exists.

18 Rather, Lord Abbett reaches past Windrush and attempts to hold individual Windrush board

19 members liable for alleged negligent misrepresentations made in the PLOM.  Having conceded at

20 oral argument that the Board Member Defendants did not make affirmative misrepresentations, Lord

21 Abbett's claim is limited to an assertion that they created misleading half-truths in the PLOM by

22 failing to disclose the Making Waves facts.  Lord Abbett posits that by leaving out the Making

23 Waves facts, the statements in the PLOM regarding tuition, enrollment, attrition, financial aid, and

24 fundraising painted a misleadingly rosy picture about Windrush's ability to achieve growth in

25 enrollment to justify the bond-financed construction.

26      Lord Abbett bases the Board Members Defendants' liability on two theories of wrongdoing.

27 First, it argues that the Board Member Defendants are individually liable for misleading half-truths

28 because each Defendant personally authorized, directed, and participated in the creation of the

United States District Court

For the Northern District of California

1   PLOM.  Second, Lord Abbett claims that each of the Board Member Defendants owed it a duty to

2   disclose the Making Waves facts and failed to do so.  The Board Member Defendants argue that

3   Lord Abbett's claim fails because, to the extent the PLOM contains any misrepresentations (which

4   the Board Member Defendants vehemently deny), there is no evidence that any of the Board

5   Member Defendants personally participated in, had knowledge of, or consented to them.  They also

6   argue that they owed no duty to Lord Abbett to disclose the Making Waves facts.  According to the

7   Board Member Defendants, Lord Abbett improperly seeks to hold them vicariously liable for alleged

8   misrepresentations by Windrush.

9            **1.      Board Member Defendants' Liability for Participation in Alleged Negligent
                        Misrepresentations in the PLOM**

10

11           "Directors or officers of a corporation do not incur personal liability for torts of the

12   corporation merely by reason of their official position, unless they participate in the wrong or

13   authorize or direct that it be done.  They may be liable, under the rules of tort or agency, for tortious

14   acts committed on behalf of the corporation."  *U.S. Liab. Ins. Co. v. Haidinger-Hayes, Inc.*, 1 Cal. 3d

15   586, 595 (1970).  As the California Supreme Court explained in *Frances T. v. Village Green Owners*

16   *Association*, 42 Cal. 3d 490 (1986), "[i]t is well settled that corporate directors cannot be held

17   *vicariously* liable for the corporation's torts in which they do not participate. . . . [A]n officer or

18   director will not be liable for torts in which he does not personally participate, of which he has no

19   knowledge, or to which he has not consented. . . . While the corporation itself may be liable for such

20   acts, the individual officer or director will be immune unless he authorizes, directs, or in some

21   meaningful sense actively participates in the wrongful conduct."  *Id.* at 503-04 (citation and internal

22   quotation marks omitted).

23           Here, it is uncontroverted that the PLOM was prepared by Stone & Youngberg, Hawkins

24   Delafield, and Windrush (by DFO Whitler).  However, Lord Abbett did not sue Windrush; instead, it

25   seeks to hold the Board Member Defendants individually liable for Windrush's statements.[4]  Under

26   _____

27           [4] Lord Abbett relies on *OCM Principal Opportunities Fund v. CIBC World Markets Corp.*, 157
     Cal. App. 4th 835, 854 (2007), to argue that the Board Member Defendants may be liable for alleged
28   misleading half-truths in the PLOM.  *OCM* is inapposite.  In *OCM*, the defendant investment bank made
     affirmative, positive statements in an offering memorandum about the established success of a fragrance

United States District Court

For the Northern District of California

the rule in *Haidinger-Hayes*, the essential question, therefore, is whether Lord Abbett has offered evidence demonstrating that each of the Board Member Defendants authorized, directed, or otherwise meaningfully participated in making the alleged misrepresentations in the PLOM.

The undisputed evidence shows that the Board Member Defendants' involvement with the preparation of the July 17, 2007 PLOM was minimal. All of them contributed biographical information about themselves for the PLOM, but the involvement of Defendants Asami, Breyer, Campbell, Hamar, Moppin, Moreland, Villeneuve, and Woodson ended there. A draft of the PLOM may have been distributed to the Board by email, but it was not submitted to the Board as a whole for their review and approval. Only Defendants Beach, Cheyette, and De Jonghe actually participated in the preparation or review of the PLOM. Beach and Cheyette reviewed and commented on drafts of the PLOM, and Cheyette worked on some unspecified financial information, some of which was incorporated into an unspecified section of the PLOM. Former Head of School De Jonghe wrote portions of early drafts on the school's history and philosophy, building plans and objectives of the strategic plans, and the PLOM's enrollment projections were based on some of her work.

In order to establish liability for negligent misrepresentation, a plaintiff must prove that the defendant made a representation as to a "past or existing material fact . . . which was untrue." *Cedars Sinai Med. Ctr. v. Mid-West Nat'l Life Ins. Co.*, 118 F. Supp. 2d 1002, 1010 (C.D. Cal. 2000) (citing *Gagne v. Bertran*, 43 Cal. 2d 481, 487-88 (1954)). Further, a plaintiff must establish a positive assertion of fact on the part of each defendant. *Byrum v. Brand*, 219 Cal. App. 3d 926, 942 (1990). The California Supreme Court has explained that where a defendant's statement "purports to state the whole truth" about a subject, "misleading half-truths" may constitute affirmative assertions for the purpose of negligent misrepresentation. *See Randi W. v. Muroc Joint Unified Sch. Dist.*, 14 Cal. 4th 1066, 1082-83 (1997).

---

company's marketing strategy while concealing information about its true financial condition and practice of "channel stuffing" that would damage its prospects in the long term. *Id*. at 847-49, 855. However, the *OCM* plaintiff brought its claim for negligent misrepresentation against the investment bank and the fragrance company; it did not seek to hold the company's individual board members liable. *Id*. at 842-43. Here, Lord Abbett does not sue Windrush. It seeks to hold individual board members accountable for Windrush's representations.

In this case, the only statements in the PLOM attributable to Defendants Asami, Breyer, Campbell, Hamar, Moppin, Moreland, Villeneuve, and Woodson are their individual biographies. Lord Abbett presents no evidence or argument that their biographical information contributed to the allegedly misleading picture of Windrush's future viability.  Accordingly, under the rule in *Haidinger-Hayes*, Asami, Breyer, Campbell, Hamar, Moppin, Moreland, Villeneuve, and Woodson are not individually liable for Windrush's alleged misrepresentations in the PLOM.

As to Beach and Cheyette, there is no record evidence that either of them meaningfully participated in drafting the sections of the PLOM that Lord Abbett identifies as creating a false impression of future fiscal health (i.e., the sections regarding tuition, enrollment, attrition, financial aid, or fundraising).  In fact, Lord Abbett presents no evidence at all identifying the specific drafts reviewed by Beach and Cheyette, or section(s) to which Cheyette may have contributed.  As there is no evidence that Beach or Cheyette authorized, directed, or actively participated in the alleged misrepresentations, Lord Abbett has failed to raise a triable fact on the question of whether Beach and Cheyette are liable for Windrush's statements in the PLOM.

As to former Head of School De Jonghe, her employment at Windrush and term on the Board ended on June 30, 2007.  There is no evidence that she drafted, revised, reviewed, or approved drafts of the PLOM or participated in any way in the bond issuance after that date.  Lord Abbett has cited no authority to support its position that a former board member or corporate director may be liable for statements made by the corporation after his or her term ended, and in fact, a "director [of a corporation] cannot be held liable for wrongs of officers that take place after the director has ceased to be a director."  *Wolf v. CDS Devco*, 185 Cal. App. 4th 903, 922 (2010) (citing 9 Witkin, *Summary of Cal. Law, Corporations*, § 105, pp. 881-82 (10th Ed. 2012) (citing *Angelus Sec. Corp. v. Ball*, 20 Cal. App. 2d 423, 434 (1937)).  Lord Abbett argues that this argument is inapposite as De Jonghe herself engaged in wrongdoing.  However, there is no evidence of "wrongdoing" by De Jonghe; the only statements in the PLOM possibly attributable to her are the enrollment projections, to which revisions were made after her employment ended.  There is no evidence that she authored, authorized, or directed the statements in the PLOM about tuition, enrollment, attrition, financial aid, and fundraising.  As to the enrollment projections themselves, they are not actionable as positive

assertions of fact for purposes of negligent misrepresentation because they were projections of what Windrush believed it could achieve *in the future*; they are not representations of "a past or existing material fact." *See Regents of Univ. of Cal. v. Principal Fin. Grp.*, 412 F. Supp. 2d 1037, 1045 (holding that a statement "manifestly about what defendants will do in the future" is not a representation of a past or existing material fact).

Indeed, Lord Abbett does not identify any specific assertions of past or existing material facts made in the PLOM that are directly attributable to the Board Member Defendants. Instead it argues, without citing any authority, that the Board Member Defendants may be held individually liable for the overall misleading impression of fiscal health created by the statements in the PLOM because they voted for the bond issuance, delegated authority with respect to the bond disclosure documents, and failed to ensure that the Making Waves facts were disclosed. The undisputed facts show that none of the Board Member Defendants authored the challenged sections of the PLOM, or approved the PLOM as a whole. Under *Haidinger-Hayes*, Lord Abbett must show that each individual Defendant authorized, directed, or actively participated in an alleged misrepresentation. It has not done so.

### 2. Board Member Defendants' Liability for Omissions

Lord Abbett also argues that the Board Member Defendants are liable because they had a duty to disclose the Making Waves facts, but failed to do so. This argument also fails.

Under California law there is no claim for negligent nondisclosure or concealment. *See Byrum*, 219 Cal. App. 3d at 941-42; *Tenet Healthsystem Desert, Inc. v. Fortis Ins. Co., Inc.*, 520 F. Supp. 2d 1184, 1195 (C.D. Cal. 2007) ("there is no liability for negligent omissions"); *Jackson v. Fischer*, 931 F. Supp. 2d 1049, 1068 (N.D. Cal. 2013) (same). To the extent some authority exists for the proposition that a negligent misrepresentation claim may be based upon an omission, in order to maintain such a claim Lord Abbett must show that the Board Member Defendants owed an independent duty to Lord Abbett to disclose the Making Waves facts. *See Levine v. Blue Shield of Cal.*, 189 Cal. App. 4th 1117, 1136 (2011) (holding that the "'misrepresentation' element of the tort of negligent misrepresentation may be established by showing 'the suppression of fact by one *bound to disclose it*.'" (emphasis in original, citation omitted)). This Lord Abbett cannot do. The Board

United States District Court

For the Northern District of California

1    Member Defendants did not vote on, ratify, sign, or endorse the PLOM.  Accordingly, no duty to

2    disclose arose on the part of the Board Member Defendants because the PLOM was not their

3    statement; it was a statement by Windrush.

### 3.    Board Member Defendants' Liability for Continuing Disclosures

5        Finally, Lord Abbett seeks to hold the Board Member Defendants liable for Windrush's

6    contractual duty to make continuing disclosures, none of which disclosed the Making Waves facts.

7    Lord Abbett appears to base this duty on Windrush's Continuing Disclosure Agreement with the

8    trustee, Wells Fargo.  (Pls.' Opp'n 33; *see* Whitler Decl. ¶ 4, Ex. 41.)  However, "[d]irectors and

9    officers are not personally liable on contracts signed by them for and on behalf of the corporation

10   unless they purport to bind themselves individually."  *Haidinger-Hayes*, 1 Cal. 3d at 595.  Lord

11   Abbett does not dispute that the Board Member Defendants are not individual parties to that

12   agreement.  Therefore, they may not be held liable for any duties created in that agreement.

13       In sum, Lord Abbett has not established that the Board Member Defendants authorized,

14   directed, or actively participated in making the alleged misrepresentations in the PLOM, nor that

15   Board Member Defendants owed Lord Abbett a duty to disclose the Making Waves facts either at

16   the time the PLOM was drafted or on an ongoing basis.  Therefore, the Board Member Defendants'

17   motion for summary judgment is granted.[5]

## B.    Stone & Youngberg's Motion

19       Lord Abbett's negligent misrepresentation claim against Stone & Youngberg is based on the

20   theory that Stone & Youngberg owed a duty to investors to disclose the Making Waves facts in the

21   PLOM, and that the Making Waves facts were material, as they rendered the enrollment, tuition, and

22   revenue projections in the PLOM "unattainable."  (*See* Compl. ¶¶ 14, 15, 18, 50, 61.)  It also brings

23   claims for violations of California and New Jersey securities laws based upon the allegation that

24   Stone & Youngberg failed to disclose material facts which were necessary to make its statements in

---

[5] Because the court finds that the Board Member Defendants are entitled to summary judgment on the grounds stated above, it does not reach their remaining arguments.  In addition, the Board Member Defendants make a number of objections to Lord Abbett's evidence submitted in opposition to their motion.  As the court did not rely on any of the objectionable evidence in reaching its decision it denies the objections as moot.

16

**United States District Court**
For the Northern District of California

the PLOM not misleading.  Stone & Youngberg moves for summary judgment on all of Lord

Abbett's claims, or in the alternative, for partial summary judgment on the negligent

misrepresentation claim as to Lord Abbett's 2010 bond purchases.

### 1.     Negligent Misrepresentation

#### a.     Choice of Law and the Statute of Limitations

Stone & Youngberg first argues that Lord Abbett's negligent misrepresentation claim is

subject to a two-year statute of limitations.  According to Stone & Youngberg, the claim accrued at

the latest in January 2010, and is thus time-barred because Lord Abbett filed suit in July 2012.  *See*

*Platt Elec. Supply, Inc. v. EOFF Elec., Inc.*, 522 F.3d 1049, 1054 (9th Cir. 2008) (holding that two-

year statute of limitations applies to negligent misrepresentation claim under California law).  Lord

Abbett denies that its claim is time-barred, arguing that New Jersey law applies.  The statute of

limitations for a negligent misrepresentation claim under New Jersey law is six years.  *See Goodman*

*v. Goldman, Sachs & Co.*, No. 10-1247 (FLW), 2010 WL 5186180, at *5 (D.N.J. Dec. 14, 2010).

The parties do not dispute that Lord Abbett's negligent misrepresentation claim was timely if New

Jersey law applies to this claim.  As this presents a conflict of laws, the court must address choice of

law principles before considering the merits of Stone & Youngberg's argument.

As the lawsuit against Stone & Youngberg  originally was filed in New Jersey, that state's

choice of law principles dictate whether Lord Abbett's negligent misrepresentation claim is

governed by New Jersey or California law.  *See Int'l Bus. Machs. Corp. v. Bajorek*, 191 F.3d 1033,

1036-37 (9th Cir. 1999) (holding that "in a transferred case, the choice of law rules of the transferor

state apply").  New Jersey applies the "most significant relationship" test set forth in the

Restatement (Second) of Conflicts of Law to determine which law applies.  *Maniscalco v. Brother*

*Int'l (USA) Corp.*, 709 F.3d 202, 206 (3d Cir. 2013).  Section 148 of the Restatement (Second) of

Conflict of Laws applies to misrepresentation claims, and is comprised of two subsections.  *Id*. at

207; *see also Goodman*, 2010 WL 5186180, at *4-5 (holding that section 148 "applies specifically to

negligent misrepresentation claims").  Pursuant to subsection (1), when the "plaintiff has suffered

pecuniary harm on account of his reliance on the defendant's false representations and when the

plaintiff's action in reliance took place in the state where the false representations were made and

received," there is a presumption that the law of that state applies.  Restatement (Second) of Conflict of Laws § 148(1) (1971); *Maniscalco*, 709 F.3d at 207.  Under subsection (2), "[w]hen the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made," courts weigh the following factors:

> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

> (b) the place where the plaintiff received the representations,

> (c) the place where the defendant made the representations,

> (d) the domicil, residence, nationality, place of incorporation and place of business of the parties,

> (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

> (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (2d) Conflict § 148(2); *Maniscalco*, 709 F.3d at 207.  "The factors enumerated in [the Restatement] should be evaluated on a qualitative rather than a quantitative basis."  *Id.* (citing *David B. Lilly Co. v. Fisher*, 18 F.3d 1112, 1119 (3d Cir.1994) (internal quotation marks omitted) (alteration in original).

As the allegedly false representations were made by Stone & Youngberg in California and received by Lord Abbett in New Jersey, subsection (1) does not apply.  *See* Restatement (2d) Conflict § 148(1) (subsection (1) applies "when the plaintiff's action in reliance took place in the state where the false representations were made *and* received" (emphasis added)).  Therefore, the court will apply the six-factor test set forth in subsection (2).  Factors (a) and (b) favor New Jersey, which is the place where Lord Abbett acted in reliance upon Stone & Youngberg's representations by purchasing the bonds, and where Lord Abbett received the representations made in the PLOM.  Factor (c) favors the application of California law, as that is where Stone & Youngberg made the representations.  Factor (d) concerns the "domicil, residence, nationality, place of incorporation and place of business of the parties."  Restatement (2d) Conflict § 148(2)(d).  Lord Abbett is a New Jersey resident and Stone & Youngberg is a California resident.  This factor weighs in favor of applying New Jersey law.  *See Maniscalco*, 709 F.3d at 208 (citing comment (i) to section 148(2),

"[t]he domicil, residence and place of business of the plaintiff are more important than are similar contacts on the part of the defendant because financial loss will usually be of greatest concern to the state with which the person suffering the loss has the closest relationship" (internal quotation marks omitted)).  The parties do not dispute that factor (e) favors California, because the subject of the transaction, Windrush, is located there.  Finally, factor (f) favors New Jersey, the state where Lord Abbett was to render performance by purchasing the bonds.  Assessing these factors qualitatively, the court finds that they weigh in favor of applying New Jersey law to this action.

Stone & Youngberg argues that the court should also consider the fact that in transferring this case to California, the New Jersey court found that "the center of gravity of this matter [was] located" in California.  (S&Y's Reply 12.)  Further, it argues that it would be inefficient to apply New Jersey common law to Stone & Youngberg while applying California common law to the Board Member Defendants.  This last point is moot, given that the court grants summary judgment on Lord Abbett's negligent misrepresentation claim against the Board Member Defendants, as discussed above.  As to the first point, the court notes that the factors that the New Jersey court considered in transferring the case included the convenience of the parties and witnesses.  These factors are not relevant to the choice of law consideration which focuses on the parties' relevant contacts.  (*See* Jaskowiak Decl. Ex. B (Opinion) at 4-5 (citing *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995) (listing public and private interest factors to be weighed when considering a motion to transfer)).)  The court's conclusion that New Jersey law applies to Lord Abbett's negligent misrepresentation claim is supported by Comment (j) to section 148(2), which provides that "[i]f any two of the [section 148(2)] contacts, apart from the defendant's domicil, state of incorporation or place of business, are located wholly in a single state, this will usually be the state of the applicable law with respect to most issues."  Here, Lord Abbett's reliance, receipt of the representations, residence, and place where it rendered performance all took place in New Jersey.  Accordingly, the court concludes that New Jersey law governs Lord Abbett's negligent misrepresentation claim.

**b.**     **Justifiable Reliance**

United States District Court

For the Northern District of California

To state a claim for negligent misrepresentation under New Jersey law, "a plaintiff must show '[a]n incorrect statement, negligently made and justifiably relied on, which results in economic loss.'" *Barows v. Chase Manhattan Mortg. Corp.*, 465 F. Supp. 2d 347, 367 (D.N.J. 2006) (citations and internal quotation marks omitted).  Therefore, Lord Abbett must prove that it justifiably relied on the representations in the PLOM. *See Richie & Pat Bonvie Stables, Inc. v. Irving*, 350 N.J. Super. 579, 589 (2002).  Stone & Youngberg moves for summary judgment on Lord Abbett's negligent misrepresentation claim on the grounds that Lord Abbett's reliance on the PLOM was unreasonable as a matter of law for three reasons: 1) the enrollment projections in the PLOM did not amount to material misrepresentations because the PLOM contained cautionary statements about forward-looking statements; 2) Lord Abbett did not believe Windrush would meet the enrollment projections in the PLOM; and 3) due to superseding information, the PLOM was stale as a matter of law by 2010, when Lord Abbett made its secondary purchases of the bonds.

The court declines to rule on Stone & Youngberg's first and second grounds, as they pertain solely to enrollment projections.  The parties did not set forth the entire factual basis for Lord Abbett's negligent misrepresentation claim against Stone & Youngberg.  According to the Complaint, it is based on the theory that Stone & Youngberg should have disclosed the Making Waves facts in the PLOM, as they rendered the enrollment, tuition, and revenue projections in the PLOM unattainable.  In the absence of a clear record of all factual assertions underlying this claim, the court must assume that it is not based solely upon alleged misrepresentations regarding enrollment projections.  The task of assessing Lord Abbett's reasonable reliance on all facts supporting this claim should be left to the jury.

As to the 2010 bond purchases, Stone & Youngberg argues that Lord Abbett cannot claim that it was misled by information in the PLOM, which was nearly two-and-a-half years old, and was superseded by the more recent information that Lord Abbett undisputedly had received.[6]  Specifically, Lord Abbett had access to or received Windrush's 2008 audited financial statement and June 2009 Bloomberg message, both of which reflected dramatic declines in enrollment, as well as

---

[6] Stone & Youngberg was not involved in Lord Abbett's 2010 purchases.

United States District Court

For the Northern District of California

1  the 2009 audited financial statement, which reported a negative cash flow, decrease in revenue, and

2  increase in expenses.

3       *Rand v. Cullinet Software, Inc.*, 847 F. Supp. 200 (D. Mass. 1994), a securities fraud case, is

4  instructive.  In *Rand*, the court granted summary judgment for defendant, holding that no reasonable

5  juror could find that a seven-month-old statement characterizing the "pipeline" of potential sales

6  prospects as "excellent," "very strong" and "very encouraging" was a substantial cause of the

7  plaintiff's financial losses.  *Id.* at 209.  The court based this conclusion in part on the fact that "a

8  reasonable jury would have to conclude that [the statements] lost any possible materiality by the

9  time of [the plaintiff's] purchase [of publicly-traded shares]," as "[s]tatements concerning a pipeline

10 of sales prospects are material for only a limited period of time."  *Id.* at 210.  The evidence in *Rand*

11 showed that before the plaintiff purchased his shares, information from many sources had entered

12 the market reflecting the outcome of the sales prospects at issue.  *Id.*

13      Lord Abbett attempts to distinguish *Rand* by arguing that the Windrush bonds were not

14 publicly traded, and that information about the bonds was not available from multiple market

15 sources.  It also argues that corrective information about the Making Waves facts was not disclosed

16 to the market prior to its 2010 purchases.  However, it is undisputed that Lord Abbett itself received

17 specific, detailed information about Windrush's current financial situation and prospects in the form

18 of the 2008 and 2009 financial statements and the June 2009 Bloomberg message about enrollment

19 prior to its 2010 bond purchases.[7]  Regardless of whether Lord Abbett had access to the Making

20 Waves facts, the financial statements and Bloomberg message provided the most updated

21 information about Windrush and rendered the 2007 PLOM's statements about enrollment, tuition,

22 and revenue projections stale as a matter of law.  No reasonable jury could find that Lord Abbett's

23 reliance on the 2007 PLOM in making the 2010 bond purchases was justifiable under the

24 circumstances.  Accordingly, the court grants partial summary judgment on Lord Abbett's negligent

25 misrepresentation claim against Stone & Youngberg based upon its 2010 Windrush bond purchases.

26

27      [7] In fact, Lord Abbett admits that Gulli's August 2010 "sell recommendation" on the Windrush
28 bonds was based in part on the 2009 financial statement, which was available to Lord Abbett as of
December 2009, prior to its January and April 2010 purchases of the bonds.

United States District Court

For the Northern District of California

1

2. **State Securities Law Claims**

2 Lord Abbett's remaining claims against Stone & Youngberg are for violations of California

3 Corporations Code sections 25401 and 25501 and New Jersey's Uniform Securities Law ("USL"),

4 New Jersey Statute section 49:3-71(a)(2), all of which prohibit misrepresentations in connection

5 with the purchase or sale of securities.  Stone & Youngberg moves for summary judgment on these

6 claims on the grounds that both laws require privity between buyer and seller in order to establish

7 liability, and that Lord Abbett cannot establish privity between itself and Stone & Youngberg.

8 Stone & Youngberg argues that privity does not exist because it acted as a placement agent for the

9 bonds and not as a seller or underwriter.

10

a. **California Corporations Code Sections 25401 and 25501**

11 California Corporations code section 25401 provides that it is unlawful for "any person, in

12 connection with the offer, sale, or purchase of a security," to "[m]ake an untrue statement of material

13 fact or omit to state a material fact necessary to make the statements made, in light of the

14 circumstances under which they were made, not misleading."  Cal. Corp. Code § 25401(b).  Section

15 25501 provides that "[a]ny person who violates Section 25401 shall be liable *to the person who*

16 *purchases a security from him . . .*"  Cal. Corp. Code § 25501 (emphasis added).  "Section 25501 on

17 its face requires privity between the plaintiff and the defendant."  *Apollo Capital Fund, LLC v. Roth*

18 *Capital Partners, LLC*, 158 Cal. App. 4th 226, 253 (2007).  Stone & Youngberg contends that it

19 cannot be held liable under section 25501 because it acted as a "placement agent" for the bonds, not

20 the underwriter or seller.  *See Apollo*, 158 Cal. App. 4th at 253 (holding that defendant that acted as

21 placement agent, not seller, could not be liable for a violation of section 25401 under section 25501;

22 noting that "no need exists to widen liability [under section 25501] to persons other than the seller"

23 given other provisions which impose liability on individuals "who materially aid[] in the act or

24 transaction" or "who materially assist[] in a violation").

25 The Municipal Securities Rulemaking Board defines a "placement agent" as "[a] municipal

26 securities dealer acting as agent who places a new issue of municipal securities directly with

27 investors on behalf of the issuer."  http://www.msrb.org/glossary/definition/PLACEMENT-

28 AGENT.aspx (last visited 7/11/2014).  It defines "underwriter" as "[a] municipal securities dealer

22

United States District Court

For the Northern District of California

1  that purchases a new issue of municipal securities from the issuer for resale in a primary offering."

2  http://www.msrb.org/glossary/definition/UNDERWRITER-OR-INVESTMENT-BANKER.aspx

3  (last visited 7/11/2014).  In other words, placement agents "place" the security with an investor,

4  while underwriters actually "purchase" or own the security, then resell it.  In support of its argument

5  that it was not the underwriter for the bonds, Stone & Youngberg points to the "Placement Agent

6  Agreement" between Stone & Youngberg, Windrush, and the CSCDA, pursuant to which it agreed

7  to "use its best efforts to identify a purchaser or purchasers" for the bonds.  (Grotenhuis Decl. ¶ 6,

8  Ex. A (Placement Agent Agreement).)

9        Lord Abbett does not dispute that California law requires privity in order to establish liability

10  under the provisions at issue.  It asserts that it is legally insignificant that Stone & Youngberg

11  referred to itself as a placement agent in its agreement with the CSCDA and Windrush, and contends

12  that it has raised a genuine dispute of fact as to whether Stone & Youngberg was the underwriter for

13  the bonds.  Lord Abbett does not argue or submit evidence that Stone & Youngberg ever actually

14  owned the bonds.  Instead, it argues that Stone & Youngberg received the bonds from the CSCDA,

15  possessed the bonds, set the price, and "sold" the bonds to Lord Abbett.  In support, it submits

16  evidence that Lord Abbett paid the bond price dictated by Stone & Youngberg directly to Stone &

17  Youngberg.  (Tiedeken Decl. Exs. 40, 41 (trade tickets showing Stone & Youngberg as "broker"),

18  42 (trade/purchase confirmations of bonds showing S&Y's Beames as "Account Executive"); 123

19  (showing S&Y priced the bonds).)  Stone & Youngberg then transferred the bonds directly to Lord

20  Abbett, as demonstrated by the trade tickets.  (Tiedeken Decl. Exs. 40-42.)  It contends that the

21  CSCDA did not pay a placement agent fee to Stone & Youngberg; rather, Stone & Youngberg

22  deducted its "underwriter's discount" of $143,000 directly from the investors' purchase money

23  before wiring the remaining funds to Wells Fargo.  (Tiedeken Decl. Ex. 123 at

24  LA_WINDRUSH_005719 (showing "Underwriter's Discount" line item for $143,000).)  In

25  addition, Stone & Youngberg referred to itself as the underwriter in all of the bond issuance-related

26  documents filed with the State of California.  (Tiedeken Decl. Exs. 46-48.)  Based on this evidence,

27

28

United States District Court

For the Northern District of California

1    Lord Abbett argues that it has raised a material issue of fact as to whether Stone & Youngberg was

2    the underwriter and thus a "seller" under section 25501.[8]

3         The court finds that Lord Abbett has failed to create a genuine issue of fact as to whether

4    Stone & Youngberg purchased or owned the bonds, thereby acting as underwriter rather than

5    placement agent with respect to the issuance and sale of the bonds in 2007.  There is no evidence in

6    the record of an actual purchase of the bonds by Stone & Youngberg, or that Stone & Youngberg

7    ever owned the bonds and resold them to investors.  Although Lord Abbett argues that Stone &

8    Youngberg "possessed" the bonds during the sale process, it does not submit any evidence of this.

9    The Placement Agent Agreement describes the mechanics of the bond issuance, stating that the

10   CSCDA was to deliver the bonds at closing to "such place as [Stone & Youngberg] shall specify or

11   as [CSCDA and Stone & Youngberg] may mutually agree upon."  (Placement Agent Agreement at 2

12   § c.)  There is no evidence in the record of where CSCDA ultimately delivered the bonds.

13   Therefore, there is no evidence that Stone & Youngberg ever actually possessed the bonds.  More

14   importantly, Lord Abbett does not cite any authority to support its contention that mere possession

15   of the bonds equals ownership for purposes of establishing privity, and the court was unable to

16   locate any such authority.

17        Although there are numerous documents in which Stone & Youngberg and others referred to

18   it as the "underwriter," labels are not controlling.  There is no evidence that any of these documents

19   _____

20        [8] Lord Abbett also submits the declaration of Cynthia King, its expert witness in securities
     matters.  Ms. King opines that Stone & Youngberg acted as an underwriter and sold the bonds to Lord
21   Abbett in 2007.  (King Decl., May 16, 2014, ¶¶ 5, 9.)  The court finds that King's opinion on this issue
     does not create a genuine dispute of fact as to whether Stone & Youngberg owned, then sold the bonds
22   to Lord Abbett.  King's opinion is based upon her interpretation of the evidence discussed above,
     including the transaction documents, Placement Agent Agreement, and documents showing that Stone
23   & Youngberg referred to itself as the underwriter.  (King Decl. Ex. 1 at 3-6.)  However, her opinion
     merely summarizes the record evidence and gratuitously interprets it.  Although King has expertise in
24   securities compliance issues, it is not clear that she has expertise in the relevant area of municipal
     finance, and moreover, her opinion about Stone & Youngberg is not clearly grounded in any expertise
25   at all.  "An expert's opinion is helpful only to the extent the expert draws on some special skill,
     knowledge, or experience to formulate that opinion; the opinion must be an *expert* opinion (that is, an
26   opinion informed by the witness' expertise) rather than simply an opinion broached by a purported
     expert."  *U.S. v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991); *see also* Fed. R. Evid. 702 (d) (a witness
27   qualified as an expert may testify in the form of an opinion if "the expert has reliably applied the
     principles and methods to the facts of the case").  Accordingly, her opinion about Stone & Youngberg's
28   role in the bond issuance is disregarded.

United States District Court

For the Northern District of California

1    governed the role that Stone & Youngberg actually played in the bond issuance or evidenced a

2    purchase of the bonds by Stone & Youngberg.  Instead, the only evidence in the record of the

3    parties' roles and responsibilities is the Placement Agent Agreement, the terms of which Lord

4    Abbett does not challenge.  For example, although Stone & Youngberg's "Closing Memorandum"

5    refers to the $143,000 "Underwriter's Discount," the Placement Agent Agreement provides that

6    "[t]he Placement Agent fee of $143,000 shall be payable at the closing."  (Placement Agent

7    Agreement at S&Y_LA_002404.)  Nowhere in the Placement Agent Agreement is there any

8    provision regarding Stone & Youngberg's purchase of the bonds.  Accordingly, as Lord Abbett has

9    failed to raise a genuine issue of fact as to privity between itself and Stone & Youngberg, the court

10   grants Stone & Youngberg summary judgment on Lord Abbett's California Corporations Code

11   sections 25401 and 25501 claim.

12                      **b.      New Jersey Uniform Securities Law**

13        New Jersey's USL provides that any person who "[o]ffers, sells or purchases a security by

14   means of any untrue statement of material fact or any omission to state a material fact necessary in

15   order to make the statements made, in light of the circumstances under which they are made, not

16   misleading" is liable under the statute.  N.J.S. 49:3-71(a)(2).  Stone & Youngberg argues that privity

17   is required in order to impose liability under this provision of the USL, citing *Kaufman v. i-Stat*

18   *Corp.*, 165 N.J. 94, 112 (2000) (holding that the USL "requires privity in securities-fraud actions").

19        Lord Abbett responds that New Jersey's definition of "seller" is broader than California

20   Corporations Code section 25501 because New Jersey has adopted the definition of seller set forth

21   by the Supreme Court in *Pinter v. Dahl*, 486 U.S. 622, 646 (1988).  In *Pinter*, the Court held that

22   under the federal Securities Act of 1933, the term "seller" includes "brokers and others who solicit

23   offers to purchase securities" if they are "motivated at least in part by a desire to serve [their] own

24   financial interests or those of the securities owner."  *Id*. at 646-47.  In support of the argument that

25   New Jersey has adopted the *Pinter* definition of seller, Lord Abbett cites *Zendell v. Newport Oil*

26   *Corp.*, 226 N.J. Super. 431, 440-41 (1988), and *Abrahamsen v. Laurel Gardens Limited Partnership*,

27   276 N.J. Super. 199, 213 (1993).

28

United States District Court

For the Northern District of California

In *Zendell*, the plaintiff brought a claim for violation of the USL against a law firm which assisted in a partnership offering, alleging that it was liable as a "seller" of the securities at issue. The court discussed the *Pinter* definition of seller and a 1974 New Jersey case, *Cola v. Terzano*, 129 N.J. Super. 47, 57-59 (1974), *disapproved on other grounds in Florczak v. United Jersey Bank*, 591 A.2d 1023 (1991), in which the court found that liability under Section 49:3-71 could be imposed with minimal participation in a sale of securities.  In *Zendell*, the court ultimately concluded that the defendant law firm did not meet even these minimal standards to be liable as a seller under the USL, as the firm had had no contact with the plaintiff and never acted as a broker, selling agent, or underwriter.  226 N.J. Super. at 440-41.  It is important to note *Zendell* grounded its more expansive definition of "seller" in reliance on *Cola*.  But *Cola*'s holding involves an earlier version of Section 49:3-71, which has since been modified.  *Cola* actually interpreted the scope of liability under then-subsection (b) of 49:3-71, which provided a basis for secondary liability for those who materially aided in a violation of the USL.  *See Cola*, 129 N.J. Super. at 53-57.  Specifically, the earlier version of 49:3-71(b) provided for liability under subsection (a) for "[e]very person who directly or indirectly controls a seller liable under paragraph (a), every partner, officer, or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller *who materially aids in the sale*, and every broker-dealer or agent who materially aids in the sale."  *Id.* at 53-54; N.J.S. 49:3-71(b) (1967) (emphasis added).[9]  Therefore, the court finds that *Zendell* does not clearly stand for the proposition that New Jersey has adopted a looser definition of the term "seller" under 49:3-71(a), the primary liability provision.

Lord Abbett also cites *Abrahamsen* to support its position.  However, in *Abrahamsen*, the plaintiff's claim arose under New Jersey's Planned Real Estate Development Full Disclosure Act, and the opinion simply referenced *Zendell* and *Cola* in considering the scope of liability under that act.  276 N.J. Super at 213.

---

[9] New Jersey amended 49:3-71 in 1997.  Previous subsection (b), which imposed secondary liability for misrepresentations or omissions of material facts in connection with the sale of securities, was expanded to include liability for investment advisers and their agents or representatives and moved to subsection (d).  *See* N.J.S. 49:3-71(d) (1997).

United States District Court

For the Northern District of California

Further, *Zendell*, *Abrahamsen*, and *Cola* all pre-date the New Jersey Supreme Court's 2000 decision in *Kaufman*.  In *Kaufman*, a shareholder sought to hold a corporation liable for fraud and negligent misrepresentation on the grounds that it had artificially inflated the price of its shares in the market by making deliberate false statements.  165 N.J. at 98-100.  In its opinion, the New Jersey Supreme Court noted that the shareholder had chosen not to proceed under the USL "because the USL requires privity in securities-fraud actions and thus will not allow her to reach the issuer of her shares or its officers."  *Id.* at 112.  The court explained that although requiring privity could "seem harsh when, as here, the victim of the alleged misstatement or omission is remote from the offending party, our Legislature imposed the requirement of privity to counterbalance an advantage for plaintiffs," which was the elimination of "reliance as an element of securities fraud entirely in favor of a system in which privity establishes causation."  *Id*. at 112-13.  Although the opinion does not mention the specific provision at issue in this case, this court finds that under *Kaufman*, 49:3-71(a) requires privity in order to establish liability.  The court finds additional support for this conclusion in the fact that, as noted above, the USL contains a provision imposing secondary liability  for misrepresentations or omissions of material facts in connection with the sale of securities.  *See* N.J.S. 49:3-71(d).  Therefore, interpreting the statutory scheme as a whole, an expansive definition of seller under the primary liability provision would render the secondary liability provision superfluous.  This would violate a basic tenet of statutory interpretation.  *See Cast Art Indus., LLC v. KPMG LLP*, 209 N.J. 208, 222 (2012) ("[i]nterpretations that render the Legislature's words mere surplusage are disfavored." (citation omitted)).

As discussed above, Lord Abbett has failed to raise a genuine dispute of fact as to whether Stone & Youngberg was a seller or underwriter of the bonds.  Accordingly, the court grants summary judgment on Lord Abbett's New Jersey USL claim.[10]

### V.  Conclusion

---

[10] In addition to objecting to King's declaration, Stone & Youngberg made a number of other objections to Lord Abbett's evidence.  As the court did not rely upon any of the objected-to evidence in reaching its decision the objections are denied as moot.

**United States District Court**
For the Northern District of California

1   For the foregoing reasons, the Board Member Defendants' motion for summary judgment is

2   granted.  Stone & Youngberg's motion for summary judgment is granted in part and denied in part.

3   Lord Abbett and Stone & Youngberg are referred to Magistrate Judge Elizabeth D. Laporte for a

4   mandatory settlement conference to take place on July 25, 2014 at 9:30 a.m.  Further information

5   regarding the settlement conference will be provided by notice from Judge Laporte.

6

7   IT IS SO ORDERED.

8

9   Dated: July 11, 2014

10

11   _____
      DONNA M. RYU
      United States Magistrate Judge

12



13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

28